## Howard, et al. v. Straight Creek Coal Co.

(Decided November 22, 1910.)

### Appeal from Bell Circuit Court.

Land—Conflicting Claims—Compromise Settlement—Valuable Consideration.—An agreement of compromise based upon a settlement in good faith of a disputed claim for land between the parties, has a valuable consideration to support it, and the court properly enforced the compromise. Few compromises of law suits would stand if settlements fairly made could be set aside when one of the parties afterwards learned that he had a better case than he supposed he had. This is one of the chances that litigants take when they compromise. Where there is no con-

cealment, no fraud, a settlement will not be disturbed because one of the parties afterwards finds out that he might have obtained a judgment more favorable to him by trying out the case on the merits.

D. B. LOGAN and J. H. JEFFRIES, for Appellant.

WILLIAM AYERS, WILLIAM LOW and E. N. INGRAM, for Appellee.

OPINION OF THE COURT BY JUDGE HOBSON—Affirming.

On April 15, 1850, a patent was issued to James and Skelton Renfro for 1,500 acres of land, lying in Bell county. The title conveyed by this patent was by regular conveyances vested in J. J. Gibson and several of his brothers, prior to the year 1880. Daniel Howard lived on an adjoining survey. He and the Gibsons sold to T. J. Asher the timber on their lands. It then developed that Howard was claiming and cutting timber which the Gibsons claimed lay within their patent. They thereupon brought a suit against Howard to recover for the cutting of the timber. Howard filed an answer; an order of the survey was made; in some way the papers of the suit were lost, and the case dragged along until 1888, when the following agreed judgment was entered:

"The parties to this action having agreed upon an amicable settlement of the above styled action it is hereby agreed that —————————— shall survey the lands in controversy so far as their titles conflict and the plaintiff's patent being the oldest is acknowledged to be superior and the defendant Daniel Howard relinquishes his claim to any land covered by plaintiff's patent, but if it occurs that said Daniel Howard has any patent older than the Gibson patent, and such older patent of Howard aforesaid covers any of the land covered by the Gibson patent then Gibson relinquishes any claim they have to such land as is covered by said older patent of said Howard.

"The parties agree to furnish said surveyor with all their evidence of title, to run said lines and lands by, whenever said surveyor shall demand the same; agree to accompany the said surveyor and show, if they can, their corners, furnish all the means in their power to identify and show up their corners, and as some timber has been sold off the premises in controversy the money for which is attached or stopped in the hands of T. J. Asher, it is

further agreed that such of the timber as came off the land which the plaintiff, Gibson, recovers, hereby shall be paid to the plaintiffs, and the balance thereof to the defendant, Daniel Howard. The costs of the action shall be paid by the defendant, Daniel Howard, but the lines hereby agreed to be surveyed is not to be regarded, or the expense of running same out is to be divided between the parties, each paying half.''

After this agreement was made Howard was unable to find the patents under which he claimed, or some of his title papers. So the matter dragged along as before, nothing more being done until the year 1899, when Gibson served on Howard the following notice:

"Pineville, August 22nd, 1899.

''Mr. Daniel Howard:

"As we have sold the timber off of our 1,500 acre patent on Dorton's Branch and the purchaser, Mr. A. J. Asher, intends to remove it at once, we again call upon you to produce any title papers older than our said patent which you may have or claim covering land inside of said patent boundary.

''We will agree with you upon a surveyor to run out your lines and mark them, or you can select your own surveyor to run the lines and we will employ one to represent us. It was agreed in the case of J. J. Gibson v. Daniel Howard that a surveyor should be appointed for the purpose of running out our lines and determining who was entitled to the money in T. J. Asher's hands for timber described in that suit. This has never been done and it is to the interest of all parties to have this matter settled, and it is to be hoped that it can be done without further litigation.

''If you refuse to comply with this request, this will be notice to you that on the 3rd day of the next October term of Bell circuit court we will move the court to reinstate the case of Gibson v. Howard on the docket, and to appoint a surveyor to survey said land, and will take such other steps as shall be necessary to obtain a judgment settling the matters in controversy and obtaining judgment for the said money in T. J. Asher's hands.''

Pursuant to the notice, the Gibsons, on October 4, had the case restored to the docket, and later at the same term an order of survey entered. After this had been done and before the order of survey had been executed, the par-

ties got together, and executed the following written agreement:

"This agreement between J. J. Gibson, T. S. Gibson, Z. S. Gibson, E. N. Gibson and George W. Gibson of the first part and Daniel Howard of the second part,

"Witnesseth: That whereas in the case of T. S. Gibson, etc., against Daniel Howard pending in the Bell Circuit court in which case the parties of the first part are plaintiffs and the party of the second part is defendant, an agreed judgment was entered and which is recorded in order book No. 5, page 92, in which it was agreed and adjudged that the parties of the first part were entitled to the land embraced in the Renfro 1500 acres patent, not embraced by any older patent owned by the parties of the second part, and providing further that the land should be surveyed and that each party should receive the purchase price of the timber cut from their respective lands, the said price of all said timber being in the hands of T. J. Asher, and whereas the said survey has never been made under said judgment; it is now agreed by the parties hereto that the costs of said suit be equally divided between the parties, that is, that the plaintiff shall pay one-half of said costs and that the defendant shall pay one-half thereof, and that the balance of said fund shall be equally divided between said parties. And it appearing that the total costs of said suit are one hundred and forty-four dollars, and that of the said sum, the said parties of the first part have paid one hundred and ten dollars, and the said party of the second part $34.00, it is agreed that the said T. J. Asher shall first pay to the said parties of the first part $38.00 and that of the remainder of said fund he shall pay one-half to the parties of the first part and one-half to the party of the second part.

"It is further agreed that the said judgment which is referred to as part hereof shall be carried out by having said survey made and that each party shall hold the land described in said suit and judgment to which they shall respectively have the senior patent or survey."

At the time this agreement was made it was agreed between the parties that about half the timber cut by Asher had been cut outside of the Renfro survey, and for this reason the money in Asher's hands was divided

equally. Shortly after the agreement was made Howard
died suddenly, and before anything further had been done
except to collect the money from Asher. After his death
a suit was filed by his children to divide among them his
lands, and in this proceeding no part of the Renfro sur-
vey was included, except such as was embraced in two
older grants held by Howard which conflicted with it.
On July 31, 1905, the children of Howard executed a
mining lease to E. N. Ingram, and this lease Ingram
shortly thereafter assigned to the Straight Creek Coal
Company. After this, and on March 3, 1906, the Gibsons
conveyed the land held by them under the Renfro patent
to the Straight Creek Coal Company. Some time after
this deed was made some of the Howards entered within
the bounds of the Renfro patent, cut some timber and
built a cabin on it; thereupon the Straight Creek Coal
Co. brought this suit against them, setting up the facts
we have stated, and praying that the agreed judgment
and the agreement of February 4, 1900 be carried into
effect; that the land should be surveyed and that the de-
fendant be required to surrender all title or claim to the
land within the Renfro patent, and for all proper relief.
The case was transferred to equity without objection;
the defendants filed an answer; proof was taken, and on
final hearing the circuit court confirmed the surveyor's
report, locating the different patents, and adjudging the
Coal Company the land embraced by the Renfro patent,
which was not included in the older patents held by
Howard. From this judgment the Howards appeal.

All the land in controversy is embraced in a patent
issued to Benjamen Say for 90,000 acres, and to Moses
Bartram for 4,000 acres, both of which are more than
.fifty years older than the Renfro patent. It is insisted
that for this reason the Renfro patent is void, and as
the plaintiff must recover upon the strength of his own
title, the petition should have been dismissed. There
would be much force in this but for the agreed judg-
ment entered in 1888, and the agreement made in 1900.
But the defendants, as the children and heirs at law of
Daniel Howard stand in his shoes. If he was estopped
to rely upon any infirmity in the Renfro patent, they
are also estopped. That he was estopped by the agreed
judgment, and the agreement of 1900 to make this ob-
jection, is manifest; for he agreed that the land should

be run out according to the respective patents of the parties, and that the one who had the older patent should hold it. The Say and Bartram patents included not only the Renfro patent but all the land held by Howard under his patents, and if he had made this objection in 1888, it would have shown his title to be defective, and might have caused him to lose the land that he was claiming. The agreement which he made concluded all defenses which he had to a recovery under the Renfro patent except as to the land embraced within the older patents under which he held; and he having waived these matters then by the agreement he cannot set them up now if the agreement is valid.

It is insisted that the agreed judgment is not a judgment at all, but only an agreement to do certain things preliminary to the entering of a judgment; that it was without valuable consideration, and was entered into by Daniel Howard through a mistake as to the facts, which existed concerning the land; that the agreement was never carried out; that he and his children continued in possession of the land and that the agreement should not now be enforced.

The judgment of 1888 was simply an entry on the order book of the court of a written agreement signed by the parties; and whether it was a final judgment or not is entirely immaterial. It was an agreement of compromise and based upon the settlement of a good faith dispute, which is a valuable consideration to support a contract. Few compromises of law suits would stand if settlements fairly made could be set aside afterwards, when one of the parties learned that he had a better case than he supposed he had. This is one of the chances that litigants take when they compromise. There was no concealment; no fraud; Howard knew as much about the matter as the Gibsons; and a settlement of this sort will not be disturbed because one of the parties may afterwards find out that he might have obtained a judgment more favorable to him by trying out the case on the merits. In Hennessy v. Bacon, 137 U. S. 78, where as here, the parties had settled a dispute as to the title to land, and one of them sought to be relieved on the ground that he had made the settlement in ignorance of the facts, the court said:

"No fraud was practiced by Rogers. He was guilty of no unfairness. He concealed nothing that he was under legal obligation to state. His information is respect to the title was no greater than Hennessy had, or that Hennessy could easily have obtained. It is the case of the compromise of a disputed claim, the parties dealing with each other upon terms of perfect equality, holding no relations of trust or confidence to each other, and each having knowledge, or having the opportunity to acquire knowledge, of every fact bearing upon the question of the validity of the respective claims. Cleveland v. Richardson, 132 U. S. 318, 329. Such a settlement ought not to be overthrown, even if the court should now be of the opinion that the party complaining of it surrendered rights that the law, if appealed to, would have sustained.

This court has in a number of cases laid down the rule in the same way. Frazier v. Steel, Sneed 334, Taylor v. Patrick 1 Bibb. 168, McIntyre v. Johnson, 4 Bibb. 48, Higgs v. Smith, 3 A. K. M. 338, Bates v. Todd, 4 Litt. 177, Mitchell v. Long, 5 Litt. 72, Waters v. Waters, 4 Dana 623, Gray v. United States Savings and Loan Co. 116 Ky. 967, Western and Southern Life Insurance Co. v. Quinn, 130 Ky. 397.

In 1 Parsons on Contracts, 439, the rule is thus well stated:

"With the courts of this country the prevention of litigation is not only a sufficient but a highly favored consideration; and no investigation into the character or value of the different claims submitted will be entered into for the purpose of setting aside a compromise, it being sufficient if the parties entering into the compromise thought at the time that there was a question between them."

We therefore conclude that the court properly enforced the compromise.

It is insisted that the Coal Company, having taken possession of the land embraced by the lease to Ingram, it could not, without surrendering it, buy in an outstanding title to the prejudice of the Howards.

The Ingram lease did not describe the land by metes and bounds. It simply gave the names of the adjoining proprietors and called for the Gibson line. It did not embrace any land that belonged to the Gibsons. When the Coal Company bought that lease there was nothing

on the face of it to apprise the purchaser that the Howards were claiming any of the land within the Gibson's claim; and the Coal Company by virtue of that lease took no title to any land that the Gibsons owned. The question of estoppel therefore cannot be made; and appellants showed no reason for the cancellation of this lease upon its counter claim. On the whole case we are satisfied from the record that Daniel Howard had no title to the land here in controversy, and that the defendants' case is without equity. The chancellor properly so held.

Judgment affirmed. Chief Justice Barker not sitting.